IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ONE PALMETTO STATE ARMORY | : | NO. 15-2202 (consolidated)[1] |
| PA-15 MACHINEGUN RECEIVER/FRAME, | : | |
| UNKNOWN CALIBER, SERIAL NUMBER | : | |
| LW001804, defendant | : | |
| And | : | |
| WATSON FAMILY GUN TRUST, claimant | : | |

MEMORANDUM

Dalzell, J.                                                                                    July 22, 2015

## I.       Introduction

Ryan S. Watson applied to the ATF to make and possess a machine gun[2], but his

application was ultimately denied for violating several Federal statutes.   He therefore brings this

action for declaratory and injunctive relief, claiming that 18 U.S.C. § 922(o), 26 U.S.C. § 5801 et

seq., which codifies the National Firearms Act ("NFA"), and the implementing regulations 27

C.F.R. § 479.1 et seq. unconstitutionally ban the transfer or possession of machine guns,

impermissibly tramples upon the Commerce Clause under Article I of the United States

Constitution, and violate his Second, Fifth and Fourteenth Amendment rights.[3]   He challenges

---

[1] On June 22, 2015 we consolidated the Government's forfeiture action at C.A. No. 15-2202 with Ryan Watson v. Loretta Lynch and Thomas E. Brandon, respectively Attorney General and Acting Director of the Bureau of Alcohol, Tobacco, Firearms & Explosives, which was assigned C.A. No. 14-6569.   We substituted the names of these officeholders pursuant to Fed. R. Civ. P. 25(d).

[2] We adopt the parties' spelling for the firearm at issue except when citing the National Firearms Act of 1934 ("NFA"), which uses the single word spelling, "machinegun."

the constitutionality of the statutes facially and as-applied.

Defendants Lynch and Brandon (collectively, "the Government") seek dismissal under Rule 12(b)(1) and 12(b)(6) or, in the alternative, move for summary judgment.  The Government contends we lack subject matter jurisdiction over Watson's constitutional claims because he lacks standing to assert them.  It also maintains that the challenged laws are consistent with the Second Amendment and the Due Process Clause, were enacted under Congress's Commerce Clause power.  The Government urges that we dismiss Watson's Equal Protection and detrimental reliance claims because it contends he has failed to establish the necessary elements.

We have jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346 because Watson's claims arise under the U.S. Constitution and the laws of the United States and the Government is the defendant.

For the reasons detailed below, we will deny the Government's motion in part and grant it in part.  We conclude that Watson has standing to challenge Section 922(o) and the NFA prohibitions on the manufacture and possession of machine guns.  But we also hold that his Second Amendment challenge to those statutes fails facially and as applied to him under well-

---

[3] 18 U.S.C. § 922(o) provides that

> (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
> (2) This subsection does not apply with respect to—
> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
> (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before [1986].

The NFA is codified at 26 U.S.C. § 5801 et seq., and is part of the Internal Revenue Code of 1986. See https://www.atf.gov/file/58141/download (last accessed on July 8, 2015).

established principles from our Court of Appeals, as does his claim that Congress exceeded its

power under the Commerce Clause in enacting those laws.  We also find his due process and

equal protection challenges fail for the reasons detailed below, and his claim of detrimental

reliance has no merit.

Accordingly, we will grant the Government's motion to dismiss Watson's complaint, but

will await definitive action from the Government as to its forfeiture action against the machine

gun.

## II.      <u>Standard of Review</u>

The Government filed a motion to dismiss pursuant to both Rule 12(b)(1) and Rule

12(b)(6) or, in the alternative, for summary judgment, and we will therefore discuss the legal

standards as they apply to the arguments before us.

### A.      <u>Motion to Dismiss Under Rule 12(b)(1)</u>

A district court considering a motion pursuant to Rule 12(b)(1) must first determine

whether that motion presents a "facial" attack or a "factual" attack on the claim at issue "because

that distinction determines how the pleading must be reviewed." <u>Constitution Party of</u>

<u>Pennsylvania v. Aichele</u>, 757 F.3d 347, 357 (3d Cir. 2014).  A facial challenge contests the

sufficiency of the complaint because of a defect on its face -- such as lack of diversity among the

parties or the absence of a federal question.  <u>See</u> <u>Mortensen v. First Federal Sav. and Loan Ass'n</u>,

549 F.2d 884, 891 (3d Cir. 1977).  In a facial challenge, we must consider the allegations of the

complaint as true and consider only those allegations in the complaint, and the documents

attached thereto, in the light most favorable to the plaintiff to see whether the plaintiff has

sufficiently alleged a basis for subject-matter jurisdiction. <u>See</u> <u>Gould Electronics Inc. v. United</u>

States, 220 F.3d 169, 176 (3d Cir. 2000); see also United States ex rel. Atkinson v. Pa. Shipbuilding Co., 473 F.3d 506, 514 (3d Cir. 2007) (terming a facial attack as "an alleged pleading deficiency").  Thus we apply the identical standard of review that we use in considering a motion to dismiss under Rule 12(b)(6).

A factual attack, on the other hand, challenges the actual failure of the plaintiff's claims to "comport with the jurisdictional prerequisites." Pa. Shipbuilding, 473 F.3d at 514.  Such an evaluation may occur at any stage of the proceeding, but only once the defendant has filed an answer.  Mortensen, 549 F.2d at 891.  When a Court is confronted with a factual attack, "[it] is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," and the plaintiff bears the burden of showing that jurisdiction does in fact exist.  Id.  Thus, a district court may consider evidence outside the pleadings, Gould Elecs. Inc., 220 F.3d at 176 (internal citation omitted), and no presumptive truthfulness attaches to the plaintiff's allegations, such that the existence of disputed material facts does not preclude a Court from evaluating the merits of jurisdictional claims.  Mortensen, 549 F.2d at 891.

A motion to dismiss for want of standing is properly brought pursuant to Rule 12(b)(1) because standing is a jurisdictional matter.  Aichele, 757 F.3d at 357 (internal citation omitted).

### B.    Motion to Dismiss Under Rule 12(b)(6)

A defendant moving to dismiss under Fed. R. Civ. P. 12(b)(6) bears the burden of proving that a plaintiff has failed to state a claim for relief.  See Fed. R. Civ. P. 12(b)(6); see also, e.g., Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  A Rule 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint and "[t]he question, then, is whether the facts alleged in the complaint, even if true, fail to support the claim." Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993) (internal citation and quotation marks omitted).  As

the Supreme Court held in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), and <u>Ashcroft v.</u>

<u>Iqbal</u>, 556 U.S. 662 (2009), in order to survive a Rule 12(b)(6) motion "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face',"

<u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 570).  A claim is plausible "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged," <u>Iqbal</u>, 556 U.S. at 678.

 Our Court of Appeals obliges district courts considering a motion to dismiss under Fed.

R. Civ. P. 12(b)(6) to engage in a two-part analysis:

> First, the factual and legal elements of a claim should be separated.
> The district court must accept all of the complaint's well-pleaded
> facts as true, but may disregard any legal conclusions.  Second, a
> district court must then determine whether the facts alleged in the
> complaint are sufficient to show that the plaintiff has a 'plausible
> claim for relief.'

<u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-11 (3d Cir. 2009) (quoting <u>Iqbal</u>, 556 U.S. at

679).

 In deciding a motion to dismiss, all well-pleaded allegations of the complaint must be

taken as true and interpreted in the light most favorable to the plaintiff, and all inferences must

be drawn in his favor.  <u>See</u> <u>McTernan v. City of York, PA</u>, 577 F.3d 521, 526 (3d Cir. 2009)

(internal quotation marks omitted).  To survive a motion to dismiss, a plaintiff must allege facts

that "raise a right to relief above the speculative level on the assumption that the allegations in

the complaint are true (even if doubtful in fact)."  <u>Victaulic Co. v. Tieman</u>, 499 F.3d 227, 234

(3d Cir. 2007) (quoting <u>Twombly</u>, 550 U.S. at 555).

**C.** **Motion for Summary Judgment**

Summary judgment is warranted if there are no genuine issues of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A party moving

for summary judgment bears the burden of proving no genuine issue of material fact exists.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986).   To that end,

the movant must inform the district court of the basis for its argument by "identifying those

portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue

of material fact," Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   Where the movant is the

defendant or the party that does not have the burden of proof on the underlying claim, it "has no

obligation to produce evidence negating its opponent's case," National State Bank v. Federal

Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992).  The movant need only point to

the lack of evidence supporting the non-movant's claim.  Id.

    The reviewing court should view the facts in the light most favorable to the non-moving

party and draw all reasonable inferences in that party's favor.  Scheidemantle v. Slippery Rock

Univ. State Sys. of Higher Educ., 470 F.3d 535, 538 (3d Cir. 2006).   A factual dispute is

"genuine" if it turns on "evidence on which the jury could reasonably find for the plaintiff."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  A fact is "material" if it "might

affect the outcome of the suit under the governing law."  Id. at 248.  That is, "only disputes over

facts that might affect the outcome of the suit under the governing law will properly preclude"

summary judgment.  Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir.

1998) (quoting Anderson, 477 U.S. at 248).

> [T]he plain language of Rule 56[] mandates the entry of summary
> judgment . . . against a party who fails to make a showing
> sufficient to establish the existence of an element essential to that
> party's case, and on which that party will bear the burden of proof
> at trial.

Celotex, 477 U.S. at 322.

If the nonmoving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, the moving party is entitled to judgment as a matter of law.  Id.  The nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  It is well-established that Rule 56 obliges the nonmoving party "to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "  Celotex, 477 U.S. at 324; see also Fed. R. Civ. P. 56(c).  Specifically, Rule 56(e) provides in relevant part that "[i]f a party fails to properly . . . address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

## III.    **Factual and Procedural Background**

We need only recite the facts pertinent to the resolution of the motions before us.  We draw our recitation primarily from plaintiff Watson's complaint.  However, as the Government has moved for summary judgment, in addition to its facial attack on our subject matter jurisdiction and its motion to dismiss, we may consider matters outside the pleadings, which here encompasses the legislative history of the statutes at issue and other archival material appended to the pleadings.

Watson is a Pennsylvania citizen and the Trustee of the Watson Family Gun Trust, an unincorporated Pennsylvania Trust.  Compl. at ¶¶ 4, 44.  On or about May 23, 2014, Watson, as Trustee of the Watson Family Gun Trust, submitted an application in paper form to the Bureau

of Alcohol, Tobacco, Firearms and Explosives ("BATFE" or "ATF") on ATF Form 5320.1 (the Application to Make and Register a Firearm) ("Form 1"),  to make a machine gun.  Id. at ¶ 37 and Ex. B.  He also submitted the required $200 making tax.  Id. at ¶ 37.  On or about June 24, 2014, he electronically submitted a second application to make another machine gun and paid the $200 making tax.  Id. at ¶ 38.  On August 5, 2014, the BATFE approved the second application, affixing the stamp and authorizing Watson to make a machine gun.  Id. at ¶ 39.  Watson made a machine gun.  Id. at ¶ 40.[4]

Around September 10, 2014, Watson received an email from the BATFE stating it had changed the status of the Form 1 from "Approved" to "Disapproved."  Id. at ¶ 41.  Watson alleges the BATFE's own policies and procedures state that an approved Form 1 can only be cancelled if "the firearm[] ha[s] not been made or modified," id. at Ex. B at 4, ¶ 5, and there is no statutory or regulatory authority for it to revoke an issued tax stamp.  Id. at ¶ 41.

The first Form 1 application was subsequently returned with a whited-out signature box, approval box, and date box, and marked "Disapproved" in two places on the application.  Id. at ¶ 43.  Watson contends these alterations show "the first application had been approved, and the BATFE subsequently unlawfully revoked (or attempted to revoke) the approval."  Id.  The application was accompanied by a letter from William J. Boyle, III, Chief of the National Firearms Act Branch, which stated in relevant part:

> Except for the possession of machineguns by or for governmental entities, the Gun Control Act of 1968 (GCA), as amended, prohibits any person from possessing a machinegun not lawfully

---

[4] Watson made his machine gun by modifying an AR-15 lower receiver into an automatic capable M-16 receiver, an irreversible modification as a result of which the firearm is permanently designated a machine gun.  Br. in Opp. at 3 and n. 2.  ATF regulations define a "receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."  27 C.F.R. § 478.11.

> possessed and registered prior to May 19, 1986.  See 18 U.S.C. §
> 922(o).  The GCA defines the term "person" to "include any
> individual, corporation, company, association, firm, partnership,
> society, or joint stock company."  See 18 U.S.C. § 921(a)(1).
> Pursuant to the [National Firearms Act]. . . ATF may not approve
> any private person's application to make and register a
> machinegun after May 19, 1986.
>
> The fact that an unincorporated trust is not included in the
> definition of "person" under the GCA does not mean that an
> individual may avoid liability under section 922(o) by placing a
> machinegun "in trust."  Where a trust is not an entity recognized as
> a "person" under the applicable law, it cannot make or hold
> property and is disregarded.  Consequently, in terms of an
> unincorporated trust, ATF must disregard such a non-entity under
> the GCA and consider the individual acting on behalf of the trust to
> be the proposed maker/possessor of the machinegun.

Id. at Ex. D.

Watson alleges that there is no prohibition on Trusts making or possessing machine guns under Section 922(o) because the statute's plain language does not include a Trust in the definition of "person."  Id. at ¶ 45.  He also contends that the BATFE's contention that it "must disregard such a non-entity under the GCA and consider the individual acting on behalf of the trust to be the proposed maker/possessor of the machine gun" is a novel interpretation that upends long-time common practice.  Id. at ¶ 46.  For example, Watson maintains that when a Trust manufactures a short barreled rifle "on a Form 1," it is required to engrave on the firearm the name of the Trust as the manufacturer, not the name of the trustee who physically makes the firearm on behalf of the Trust.  Id. (citing 26 U.S.C. § 5842(a)).

On or about October 10, 2014, a BATFE Field Agent contacted Watson to ask whether a machine gun had in fact been made pursuant to the approved Form 1 and informing him such a firearm would have to be surrendered to the BATFE.  Id. at ¶ 48.  Watson also spoke with a BATFE attorney on or about October 15, 2014 who also told him that the firearm, if made,

would have to be surrendered.  Id. at ¶ 49.  Thereafter, Watson expressed his concern to the

BATFE Agent that he would face criminal charges if he surrendered his machine gun.  Id. at ¶

50.

On or about November 3, 2014, Watson received a certified letter from Essam Rabach,

Special Agent in Charge of the Philadelphia BATFE Field Division, which stated in relevant

part:

> If you ha[ve], in fact, already made a machine gun in reliance on
> ATF's erroneous approval of your ATF Form 1, you should make
> arrangements . . . to abandon or otherwise surrender it.  This is
> critical not only as a matter of public safety, but because
> possession of this unregistered machine gun is a Federal Felony. . .
> Special Agent Kovach assured you that ATF is only interested in
> recovering the illegal and unregistered machine gun and has
> absolutely no interest in using your surrender of this machine gun
> to further a criminal prosecution. . . .

Id. at ¶ 51; see also Ex. E.

On or about November 14, 2014, Watson under protest surrendered his machine gun to

BATFE Special Agent Kovach "without waiving any rights to contest the illegal mandate by the

BATFE that he surrender that firearm."  Id. at ¶ 52.

Watson contends that machine guns come under Second Amendment protection as the

Supreme Court described the Amendment's ambit in United States v. Miller, 307 U.S. 174

(1939), and are not inherently dangerous.  Id. at ¶¶ 12, 13.  "Prior to 1986, registered machine

guns were involved in so few crimes that the then [BATFE director] stated during congressional

hearings that 'machine guns which are involved in crimes as so minimal so as not to be

considered a law enforcement problem.' "  Id. at ¶ 25 (internal citation omitted).  He also

contends that there is no evidence machine guns have any effect on interstate commerce.  Id. at

¶¶ 22, 25, 26.  "Even if Congress had the power to regulate machine guns under the Commerce

Clause," Watson alleges that the ban imposed on machine guns after 1986 "is not 'regulating'

under the meaning of the Commerce Clause, especially in light of the protected Second

Amendment rights." Id. at ¶ 27.  He also maintains that the term "person" as defined in the Gun

Control Act ("GCA") does not include an unincorporated Trust, which the BATFE

acknowledged in an opinion letter to another entity.  Id. at ¶¶ 28, 29.  He alleges that the

BATFE's "new interpretation" that unincorporated trusts are prohibited from manufacturing or

possessing machine guns means the agency violated the law by approving his application in the

first place.  Id. at ¶ 54.  Watson also alleges that he made the firearm in detrimental reliance on

the BATFE's "guarantee. . . that such manufacture would not be in violation of any law." Id. at ¶

55.  Finally, he claims that he as Trustee may make and possess a machine gun "under the plain

language of 18 U.S.C. § 922(o)," which exempts from its prohibition on the transfer or

possession of a machine gun the "possession by or under the authority of[] the United States or

any department or agency thereof." Id. at ¶ 56 (quoting 18 U.S.C. § 922(o)(2)(A)).

Watson claims five grounds for relief.  He seeks declaratory and injunctive relief that 18

U.S.C. § 922(o) is unconstitutional or unconstitutional as applied to him in violation of the

Commerce Clause and asks that we bar the defendants from revoking his issued stamp.  Id. at ¶

61.  He also claims Section 922's machine gun ban and the BATFE's disapproval of his first

Form 1 violate the Second Amendment and he seeks a declaration that 26 U.S.C. § 5801 et seq.

is also unconstitutional or unconstitutional as-applied to him  Id. at ¶ 69.  He further claims that

the defendants deprived him of his property interest in his machine gun and approved application

in violation of the Fifth Amendment.  Id. at ¶¶ 71, 72.  Watson claims the BATFE violated his

right to Equal Protection under the Fourteenth Amendment by permitting others, but not him, to

manufacture machine guns post-1986.  Id. at ¶ 76.  Watson urges that the Agency be enjoined

from enforcing Section 922(o) and Section 5801 in a manner that would result in him losing "his property interest in his Form 1 or manufactured machine gun" or being charged criminally.  Id. at ¶ 79.  And, finally, he seeks to estop BATFE from revoking the Form 1 on which he claims to have detrimentally relied.  Id. at ¶ 79.

Watson filed his complaint on November 14, 2014.  The Government filed its motion to dismiss or, in the alternative, for summary judgment on January 16, 2015.  On January 23, 2015, Watson filed an uncontested motion for an Order of preservation of the machine gun, which we granted three days later.  On June 12, 2015, Watson moved to consolidate this matter with the Government's later-filed forfeiture action.  We granted Watson's motion to consolidate on June 22, 2015.[5]

## IV.   Discussion

### A.   Overview of the Statutory Scheme

Congress regulates the interstate firearms market through the GCA, as amended, 18 U.S.C. Chapter 44, and the NFA, 26 U.S.C. Chapter 53.  MTD at 2. The BATFE is charged with the administration and enforcement of those statutes and the defendants oversee that enforcement.  Id.  The NFA requires, inter alia, that all who are engaged in the business of firearms, including machine guns, and all firearm owners register with the Collector of Internal Revenue, and also subjects firearms sales to a special tax and requires firearm transactions to be conducted using written forms.  Id. at 2, 3.  The NFA also requires a firearm maker to obtain authorization, prior to manufacturing a firearm, "in such manner as required" by the statute.  Id. at 3 (quoting 26 U.S.C. § 5841(c)).  With respect to machine guns, "[d]ecades of federal laws

---

[5] By the time we closed C.A. No. 14-6569, the Government had, as rehearsed, filed the motion that we address at length here.  To avoid confusion, we dispose of it notwithstanding the consolidation.

and regulations" restrict their manufacture and possession to protect from their use as "lethal weapons [that] could be used readily and efficiently by criminals or gangsters in furtherance of criminal activity." Id. at 1 (quoting United States v. Thompson/Center Arms Co., 504 U.S. 505, 517 (1992) (internal quotation marks omitted)); see also Ex. 1.

The NFA defines a machine gun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger" or parts thereof, including "any combination of parts from which a machinegun can be assembled." Id. at 3 (quoting 26 U.S.C. § 5845). The NFA requires a would-be firearms maker to (1) file a written application to make and register the firearm, (2) pay any applicable tax, (3) identify the firearm to be made, (4) identify himself on the form, and (5) obtain the ATF's approval with the application showing such approval. Id. (citing 26 U.S.C. § 5822). The Government states that Section 5822 and the ATF's implementing regulation provide that the ATF will not approve an application to make a firearm if its making or possession "would place the person making the firearm in violation of law," including in violation of the NFA. Id. at 4; see also 27 C.F.R. § 479.65 and 26 U.S.C. § 5861(f).

The GCA supplants earlier firearms regulations, including the Federal Firearms Act of 1938, adopted under the Commerce Clause. MTD at 4; see also Ex. 2. In 1986, Congress enacted the Firearms Owners' Protection Act, adding Section 922(o) to the GCA. Id. at 5. Section 922(o)(1) makes it "unlawful for any person to transfer or possess a machinegun," except with respect to

> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
> (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before [1986].

Id. (quoting 18 U.S.C. § 922(o)(2)).  The GCA defines "machinegun" by incorporating the NFA's definition. Id.; see also 18 U.S.C. § 921(a)(23).

The Government observes that this litigation "arise[s] in part from different definitions of the term 'person' employed by the NFA and GCA."  MTD at 5.  The GCA defines "person" to "include any individual, corporation, company, association, firm, partnership, society, or joint stock company."  Id.; see also 18 U.S.C. § 921(a)(1).  The NFA does not specifically define "person."  The Government states that in the absence of a definition, the general definition in the Revenue Code controls: "an individual, trust, estate, partnership, association, company, or corporation, " see 26 U.S.C. § 7701(a)(1); see also Br. in Opp. at 30.  Accordingly, the Government contends that the definition of "person" under the NFA includes "Trust", but the GCA definition does not.  MTD at 5.

B.        **Threshold Inquiry: Whether Watson's Challenges Are Facial or As-Applied**

The difference between a facial challenge and an as-applied challenge is significant.

A plaintiff asserting a facial challenge "seeks to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question."   City of Chicago v. Morales, 527 U.S. 41, 55 n. 22 (1999).  Thus, the plaintiff succeeds in a facial challenge only by showing that "no set of circumstances" exists under which the statute at issue would be valid, Heffner v. Murphy, 745 F.3d 56, 65 (3d Cir. 2014) -- a particularly demanding standard.

The Supreme Court disfavors facial challenges for several reasons.  As the Court explained in Washington State Grange v. Wash. State Republican Party, 552 U.S. 442, 450 (2008), "Claims of facial invalidity often rest on speculation" about the reach of a statute and "run contrary to the fundamental principle of judicial restraint" by anticipating a constitutional rule before it can be decided.  Because the remedy for a successful facial challenge is the

complete invalidation of the law, "we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." Id.

By contrast, as our Court of Appeals has held, "[a]n as-applied attack ... does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." United States v. Marcavage, 609 F.3d 264, 273 (3d Cir. 2010).  The distinction, then, between a facial challenge and an as-applied challenge goes to the scope of the statute's claimed constitutional infirmity and the breadth of the remedy sought.  See Citizens United v. Federal Election Comm'n, 558 U.S. 310, 331 (2010).  The remedy for a facial challenge is the broad invalidation of the statute in question, but the remedy for an as-applied challenge bars its enforcement against a particular plaintiff alone under narrow circumstances.  See CMR D.N. Corp. v. City of Philadelphia, 703 F.3d 612, 624 (3d Cir. 2013).  Our Court of Appeals has also cautioned that district courts granting injunctions in such cases should craft remedies "no broader than necessary to provide full relief to the aggrieved plaintiff."  McLendon v. Continental Can Co., 908 F.2d 1171, 1182 (3d Cir. 1990) (internal citation omitted).

Watson's Commerce Clause claim seeks "declaratory and injunctive relief barring defendants from attempting to unilaterally revoke an issued stamp on his Form 1 and further," a determination that Section 922(o) is "unconstitutional or unconstitutional as applied against" him, see Compl. at ¶ 61.  He similarly frames his Second Amendment challenge to Section 922(o) and 26 U.S.C. § 5801 et seq., see id. at ¶ 69.  The Government does not address whether Watson's claim is properly facial or as-applied.  But we conclude that Watson asserts his Commerce Clause and Second Amendment as both facially and as-applied.

While the "usual judicial practice" is to address an as-applied challenge before a facial

challenge,  United States v. Mitchell, 652 F.3d 387, 406 (3d Cir. 2011) (internal citations omitted), our Court of Appeals has reversed that order in the case of "presumptively lawful" prohibitions -- as here.  See United States v. Barton, 633 F.3d 168, 172 (3d Cir. 2011).

###### C.       Watson's Standing to Bring This Suit

The "irreducible constitutional minimum" of standing contains three elements: "(1) the invasion of a concrete and particularized legally protected interest and resulting injury in fact that is actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of, meaning that the injury must be fairly traceable to the challenged action of the defendant; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Blunt v. Lower Merion School Dist., 767 F.3d 247, 278 (3d Cir. 2014) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).

The Government argues that we must dismiss Watson's Second Amendment and Commerce Clause claims because he fails to satisfy the traceability and redressability requirements for standing.  MTD at 8.  It argues that Pennsylvania law independently bars Watson's possession of a machine gun.  Id. at 9.  Pursuant to 18 Pa. Cons. Stat. Ann. § 908(a), "[a] person commits a misdemeanor of the first degree if, except as authorized by law, he . . . possesses any offensive weapon," and where subsection (c) defines an "offensive weapon" to include a "machine gun".  As a result, the Government maintains, Watson cannot show that the harm he alleges "is caused by the NFA and GCA provisions that likewise prohibit him from making or acquiring" a machine gun.  MTD at 9.  The Government contends that Watson cannot show "traceability" because the Commonwealth's prohibition undercuts his argument that his alleged Second Amendment and Commerce Clause injuries are "traceable to federal law and not the result of the independent action of some third party not before the court."  Id. at 9, 10

16

(quoting Lujan, 504 U.S. at 560) (internal quotation marks and alterations omitted).  In a like

vein, the Government argues that granting Watson's request for declaratory relief would not

redress these two claimed injuries because "the limitations imposed by [state law] would remain

unchanged." Id. at 10 (quoting McConnell v. FEC, 540 U.S. 93, 229 (2003)).

      Pennsylvania provides an exception to the machine gun prohibition when the possessor

"complied with the National Firearms Act."  Id. at 10 n. 7 (quoting 18 Pa. Cons. Stat. Ann. §

908(b)(1)).  The Government maintains this safe harbor does not affect its standing analysis

because, should Watson succeed on his two claims, "there would be no NFA regulation available

for him to comply with, leaving him subject to the Pennsylvania prohibition."  Id.

      Watson responds in opposition that the Government's argument mischaracterizes

Pennsylvania law "as independently forbidding [his] possessing a machine gun" and forestalling

him from showing that the NFA and GCA caused him any harm.  Br. in Opp. at 6, 7.  He points

us to the defendants' communications with him that cite those federal statutes as the reason for

revoking his applications and confiscating his firearm.  Id. at 7.

> Quite simply, the [d]efendants used the NFA and GCA as a basis
> to violate [p]laintiff's constitutionally protected rights and
> accordingly, [his] injury is directly traceable to the [d]efendants
> and the challenged laws, and a favorable ruling will redress the
> injury.

Id.  He observes that the Pennsylvania statute's exception means the state statute presents no bar

to his machine gun possession because he claims to be in full compliance with the NFA.  Id.  He

further argues that, were we to declare machine guns protected under the Second Amendment,

striking down Section 922(o) and the NFA, "any theoretical Pennsylvania prohibition on

machine guns would also be unconstitutional" because the Second Amendment right to bear

arms validated in District of Columbia v. Heller, 554 U.S. 570 (2008), was incorporated against

the States in <u>McDonald v. City of Chicago, Ill.</u>, 561 U.S. 742 (2010).  <u>Id.</u> at 8.  Finally, Watson contends that the defendants' argument at best attacks his standing to challenge the NFA, but has no merit with respect to his other claims for relief.  <u>Id.</u>

The Government replies that Watson's response is limited to his Second Amendment claim and "does not address in any way" its contention that his Commerce Clause claim, Count I of his complaint, "cannot be redressed in this action." Reply at 2.  The Government contends that by Watson's failure to reply to its argument that he lacks standing as to this cause of action, he thereby waives his opportunity to demonstrate standing.  <u>Id.</u>  The Government also contests Watson's argument that the future invalidation of the Pennsylvania statute could demonstrate redressability.  "Plaintiff has not sued Pennsylvania, and redressability for [his] purported Second Amendment 'injury' is therefore lacking."  <u>Id.</u>

In his surreply, Watson maintains that the Government seeks to mislead the Court into believing that Pennsylvania law prohibits the possession of machine guns -- a contention he claims would be readily refuted through discovery of the records of the National Firearms Registration and Transfer Record of registered machine guns owned by civilians in Pennsylvania.  Sur. at 1.

As we stated above, a motion to dismiss for want of standing is properly brought pursuant to Rule 12(b)(1) because standing constitutes a jurisdictional threshold.  <u>Aichele</u>, 757 F.3d at 357 (internal citation omitted).  Our standing inquiry must be "especially rigorous when reaching the merits of the dispute as it would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." <u>Raines v. Byrd</u>, 521 U.S. 811, 819-20 (1997).  Each element of the standing inquiry "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof."  <u>Hayes v. Wal-Mart Stores, Inc.</u>,

725 F.3d 349, 361 n. 11 (3d Cir. 2013) (quoting Lujan, 504 U.S. at 561).  Nonetheless, we are

mindful of Justice Scalia's admonition that "when an individual who is the very object of a law's

requirement or prohibition seeks to challenge it, he always has standing."  Antonin Scalia, The

Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U.L.Rev.

881, 894 (1983) (emphasis in original) (cited with approval in Aichele, 757 F.3d at 362.)

     Our first step is to determine whether the movant proffers a facial or factual attack.  In re

Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir.

2012).  As the Government filed its motion to dismiss before filing an answer, its motion

constitutes a facial attack on Watson's claims and we apply the identical standard of review that

we use in considering a motion to dismiss under Rule 12(b)(6), that is to say, we consider only

the allegations of Watson's complaint in the light most favorable to him.  See Gould Elec. Inc.,

220 F.3d at 176.  Here, Watson points to the disapproval of his Form 1 and the Government's

letter from William J. Boyle, III, Chief of the National Firearms Act Branch, in which Boyle

cites both the GCA's prohibition against possessing a machine gun and the NFA's ban on the

ATF approving any application to make a machine gun after May of 1986, see Boyle letter,

Compl. at Ex. D.  Watson also alleges that he complied with the NFA's requirements to (1) file a

written application to make and register the firearm, (2) pay any applicable tax, (3) identify the

firearm to be made, (4) identify himself on the form, and (5) obtain the ATF's approval as shown

on the application.  See Compl. at ¶¶ 37, 38, 39.

     Turning first to the traceability requirement, a federal court may "act only to redress

injury that fairly can be traced to the challenged action of the defendant, and not injury that

results from the independent action of some third party not before the court."  Aichele, 757 F.3d

at 366 (internal citation omitted).  But, as our Court of Appeals has explained, this causation

inquiry is not cognate with tort proximate cause:  "there is room for concurrent causation in the analysis of standing."  Id. (citing with approval Libertarian Party of Va. v. Judd, 718 F.3d 308, 316 (4th Cir. 2013) (holding that if a petition witness residency requirement was "at least in part responsible for frustrating [plaintiff's] attempt to fully assert his First Amendment rights in Virginia, the causation element of Lujan is satisfied")).  Indeed, our Court of Appeals has held that an indirect causal relationship will suffice, so long as there is "a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant[s]."  Toll Bros., Inc. v. Twp. of Readington, 555 F.3d 131, 142 (3d Cir. 2009) (internal citation omitted).

The Government urges us to rely on decisions from other Courts of Appeals that found no standing where activity was banned by both state and federal statute, and thus the alleged injury could not be traced to a federal statute alone.  See, e.g. White v. United States, 601 F.3d 545 (6th Cir. 2010) (no standing for gamefowl sellers to challenge Animal Welfare Act provisions banning animal fighting because alleged injuries not traceable to AWA alone); see also San Diego Cty. Gun Rights Committee v. Reno, 98 F.3d 1121, 1130 (9th Cir. 1996) (injury not traceable to federal statute banning assault weapons where a separate state law "also bans the manufacture, sale and distribution of certain delineated assault weapons").

Our Court of Appeals has not considered in a precedential opinion whether the existence of a state statute banning activities similar to those prohibited in a challenged federal statute undercuts traceability.  But White and Reno do not persuade us.  The state statutes in each of these cases are not cognate with what is before us.  In White, for example, where the Sixth Circuit concluded that gamefowl sellers' alleged injuries were not traceable to only the AWA, the AWA restricted various activities associated with animal fighting but did not prohibit animal fighting or cockfighting, whereas "[c]ockfighting is banned to a greater or lesser degree in all

20

fifty states." White, 601 F.3d at 552.  Thus, the Sixth Circuit concluded that plaintiffs' alleged injury was not traceable to the challenged law alone because state laws independently banned certain comparable activity.  And, in Reno, the Ninth Circuit pointed to an earlier enacted California statute, the Roberti-Roos Assault Weapons Control Act of 1989, to conclude plaintiff's allegation of economic injury due to the federal assault weapon ban must fail because the challenged federal statute "is neither the only relevant piece of legislation nor the sole factor affecting the price of grandfathered weaponry."  Reno, 98 F.3d at 1130.

Unlike the state statutes at issue before the Sixth and Ninth Circuits, the Commonwealth statute at issue here does not supply freestanding grounds to forbid machine gun use or possession, if the maker or owner "complie[s] with the National Firearms Act," 18 Pa. Cons. Stat. Ann. § 908(b)(1).  Rather, Pennsylvania does not independently ban such firearms but rather piggybacks on an existing federal statute by incorporating its requirements.  Watson claimed that he complied with the NFA's five requirements, see Compl. at ¶¶ 37, 38, 39, which we take as true and interpret in the light most favorable to him, as we must in this posture.  Such compliance brings him under the Commonwealth's safe harbor exception and therefore leaves no independent ground to prohibit his machine gun possession.  Equally persuasive is Watson's argument that, should he prevail in his NFA challenge, the Commonwealth statute would also fail.  We do not agree with the Government that Watson has failed to show that his alleged injuries are traceable to the federal statutes he challenges.  As the Government points to no other Commonwealth statute that undercuts Watson's claim that his alleged Commerce Clause injury is also traceable to the federal statutes he challenges, we conclude that he has met the second prong of the standing requirement and can assert both constitutional challenges.

Our Court of Appeals teaches that redressability is "closely related" to traceability:

"[W]hile traceability looks backward (did the defendants cause the harm?), redressability looks forward (will a favorable decision alleviate the harm?)."  Toll Bros., 555 F.3d at 142 (internal citation omitted) (parenthetical remarks in original).  This element requires a showing that the injury will be redressed by a favorable decision but it is also "sufficient for the plaintiff to establish a substantial likelihood that the requested relief will remedy the alleged injury in fact." Id. at 143 (internal citation and quotation marks omitted).  The Government points us to a nonprecedential decision from our Court of Appeals to argue that granting Watson the relief he seeks would not redress his alleged Second Amendment and Commerce Clause injuries because the limitations imposed by state law would remain in place.  See Coastal Outdoor Adver. Grp. LLC v. Twp. of E. Hanover, NJ, 397 F. App'x 794, 795 (3d Cir. 2010).

We do not agree that our Court of Appeals's decision in Coastal Outdoor compels the conclusion that Watson fails to meet the standing requirement's third prong.  There, our Court of Appeals concluded that, although the billboard company suffered an injury traceable to a Township ordinance, the injury the plaintiff suffered was nonetheless not redressable because unchallenged zoning restrictions would still prevent it from erecting billboards "even if the Township's superseded prohibition on billboards were unconstitutional."  Id.

That is not the case here.  Although Watson does not challenge the Commonwealth statute, he points out that its reliance on the framework of the NFA means a decision striking down that federal statute would also sweep away the Pennsylvania prohibition on machine guns. We agree.  See McDonald, 561 U.S. at 591 ("We therefore hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in Heller.").

We conclude that Watson satisfies all aspects of standing to challenge the NFA and GCA and will therefore deny the Government's motion to dismiss for want of subject matter

22

jurisdiction.

### D.    **Watson's Second Amendment Challenge**

The Second Amendment provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

### 1.    **The Government's Motion to Dismiss**

The Government offers a series of arguments as to why Watson's machine gun is properly excluded from Second Amendment protection.

First, the Government points to the Supreme Court's recognition that the rights secured by the Second Amendment are not unlimited to argue that longstanding prohibitions against certain types of weapons impose continued ineligibility for Second Amendment protection after Heller.  MTD at 13, 14 (quoting Heller, 554 U.S. at 626, 621-22).  "Consistent with the view expressed in Heller, the Third Circuit and every other federal circuit to subsequently address the issue has determined there is no Second Amendment right to possess a machine gun."  MTD at 15.  The Government argues further that the Second Amendment right upheld in Heller was a right to bear arms in self-defense, not an individual's right to possess any specific firearm or type of firearm.  Id. at 16 (citing Heller, 554 U.S. at 627 and United States v. Marzzarella, 614 F.3d 85, 94-95 (3d Cir. 2010), cert. denied, 131 S.Ct. 958 (2011)).  At the same time, the Government rejects as foreclosed by Heller, Watson's argument that defense of country is a "new central purpose of the Second Amendment."  Reply at 3.

Our Court of Appeals in Marzzarella "adopted a two-step framework for analyzing firearms restrictions challenged on Second Amendment grounds."  MTD at 12.

> First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid.

614 F.3d at 89 (internal citation omitted).  The Government contends that analysis requires Watson's claim to be resolved only at Marzzarella's Step One, because Heller's "presumptively lawful regulatory measures" against certain longstanding prohibitions are "exceptions to the right to bear arms."  MTD at 17 (quoting Marzzarella, 614 F.3d at 91 (citing Heller, 554 U.S. at 627)); see also Joseph Blocher, Categoricalism and Balancing in First and Second Amendment Analysis, 84 N.Y.U. L. Rev. 375, 413 (2009) ("Heller categorically excludes certain types of 'people' and 'Arms' from Second Amendment coverage, denying them any constitutional protection whatsoever") (cited with approval in Marzzarella, 614 F.3d at 91 n. 6).  The Government urges that restrictions on machine gun possession are longstanding and presumptively lawful restrictions derived from historical regulation of machine guns.  MTD at 17, 18; see also Drake v. Filko, 724 F.3d 426, 432 (3d Cir. 2013), cert. denied sub nom. Drake v. Jerejian, 134 S.Ct. 2134 (2014).  "Historical State restrictions likewise demonstrate that . . . laws prohibiting an entire class of weapons as dangerous or unusual are not anomalous."  MTD at 19 (citing state statutes); see also Exs. 4 (Founding-Era state militia laws[6] governing permitted

---

[6] Indeed, Congress in 1792 in the Second Militia Act, § 1, 1 Stat. 271-72, provided that:

> every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch, with a box therein, to contain not less than twenty four cartridges, suited to the bore of his musket or firelock, each carriage to contain a proper quantity of powder and ball; or with a good rifle, knapsack, shot-pouch, and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder;

weapons) and 6 (selected 19th and 20th century state laws prohibiting possession of certain categories of weapons).

Should we nevertheless hold that the machine gun ban burdens Watson's Second Amendment rights, the level of scrutiny remains unresolved under Heller.  The Government presses the Supreme Court's reasoning in Bullock v. Carter, 405 U.S. 134, 143 (1972) that "not every limitation or incidental burden on the exercise of a constitutionally protected right is subject to a stringent standard of review", to argue that the Second Amendment triggers more than a single standard of review.  MTD at 21 (internal quotation marks omitted); see also Marzzarella, 614 F.3d at 97.

The Government argues that the burden here is minimal and, as such, does not require heightened scrutiny.  Id.  A machine gun prohibition, the Government contends, does not substantially burden the self-defense right central to the Second Amendment.  Id. at 22 (quoting Heller, 554 U.S. at 628).  While the Government contends that the challenged provisions would satisfy strict scrutiny because they are "presumptively lawful," id. at 24 n.16 (quoting Heller, 554 U.S. at 527 n. 26), it maintains the statutes "readily withstand" the Third Circuit's three-part intermediate scrutiny test.  Id. at 24.[7]

_____

> and shall appear, so armed, accoutered and provided, when called
> out to exercise, or into service, except, that when called out on
> company days to exercise only, he may appear without a
> knapsack.  That the commissioned [O]fficers shall severally be
> armed with a sword or hanger and espontoon, and that from and
> after five years from the passing of this act, all muskets from
> arming the militia as is herein required, shall be of bores sufficient
> for balls of the eighteenth part of a pound.

[7] The Government describes the requirements of our Court of Appeals's test for intermediate scrutiny as showing (1) a reasonable fit between the challenged law and the governmental interest, (2) the Court's "substantial deference to the legislature's predictive judgments," Drake, 724 F.3d at 436-37 (alteration's omitted), and (3) empirical evidence "needed to satisfy

The Government points, inter alia, to the NFA's legislative history where Congress found "there is justification for permitting the citizen to keep a pistol or revolver for his own protection without any restriction, [but] there is no reason why anyone except a law officer should have a machine gun or sawed-off shotgun." Id. at 23 and Ex. 7 (quoting H.R. Rep No. 73-1780, at 1 (1934)).

> Because other categories of firearms are equally useful -- if not more so -- for self-defense than machine guns, the burden on the Second Amendment right is at most "marginal [and] incremental" and therefore does not warrant significantly heightened scrutiny.

MTD at 23 (quoting United States v. Decastro, 682 F.3d 160, 166 (2d Cir. 2012)). While our Court of Appeals has adopted certain First Amendment approaches for Second Amendment cases, the Government maintains that our Circuit has repeatedly rejected adopting the First Amendment's distinctions between content-based, and time, place, and manner regulation. Reply at 6. See Barton, 633 F.3d at 172 n. 3; see also Drake, 724 F.3d at 435.

Finally, the Government rejects Watson's assertion claiming that there is no statistical support regarding the criminal use of machine guns, and it relies on data from the National Crime Information Center concerning machine gun theft and a 1991 study finding 35% of juvenile inmates had owned "a military style automatic or semi-automatic rifle" prior to their confinement. Reply at 9. "[I]f the eight decades of federal legislation regulating machine guns . . . have succeeded in limiting [their] use for criminal purposes, such success would hardly cast doubt on previous findings about the criminal utility of machine guns or their other dangers. Id. See also Drake, 724 F.3d at 436-37 ("When reviewing the constitutionality of statutes, courts accord substantial deference to the legislature's predictive judgments.") (internal citation and

---

heightened judicial scrutiny of legislative judgments" which varies with "the novelty and plausibility of the justification raised." MTD at 24 (quoting Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 391 (2000)).

alteration omitted).

### 2. __Watson's Brief in Opposition__

Watson responds with several arguments.

He observes that the Second Amendment recognizes valid justifications besides self-defense -- such as hunting and resistance to tyranny, Br. in Opp. at 9.  He argues first that machine guns "are overwhelmingly chosen by militaries throughout the world for defense of [country], . . . a lawful purpose of firearm ownership" and one recognized by the Supreme Court in Heller, id. at 11.  And he maintains further that the Second Amendment also protects military use, Surreply at 2, and that machine guns have "self-defense value."  Id. at 3.  He urges that we distinguish between machine guns and "destructive devices" (such as "anti-personnel mines, rocket-propelled grenades. . .[and] surface-to-air missiles.")  Id.

Thus, he contends, we should not apply the Marzzarella two-step test because 18 U.S.C. § 922(o)'s prohibition on machine guns manufactured after 1986 "amounts to a categorical ban similar to those struck down in Heller and McDonald."  Br. in Opp. at 10.

Nonetheless, were we to apply the Marzzarella test, Watson next contends, we should still find Section 922(o) unconstitutional.  Watson argues that we should adopt traditional means-end scrutiny from First Amendment analysis to find that Section 922(o) is a content-based prohibition that must be analyzed under strict scrutiny.  Id. at 21, 22.  He contends that the "dangerous and unusual" standard pertains only to the way in which a firearm is carried -- that is, the common law crime of affray[8] --  and not, as here, to the mere possession of a firearm, id. at 13, 14.  Therefore, so his argument goes, Heller's prohibition against "dangerous and unusual"

---

[8] Without the slightest citation to judicial authority, Watson cabins Heller's "dangerous and unusual weapons", 554 U.S. at 627, to that common law crime.

weapons is akin to a time, place, manner restriction under the First Amendment, not a categorical prohibition on the possession of certain weapons not covered under the Second Amendment.  Id. at 17.  Accordingly, Watson argues that we must evaluate the machine gun prohibition under "the appropriate form of means-end[] scrutiny, and not simply stop the test at the first step."  Id.

Watson also contests the Government's argument that longstanding prohibitions on machine gun possession or purchase are "derived from historical regulations," id. at 17, 18.  He contends that, for the most part, the state statutes on which the Government relies do not support a machine gun ban.  Id. at 19.

Finally, Watson maintains that Section 922(o) cannot survive the strict scrutiny requirement that a statute serve a "compelling governmental interest and be narrowly drawn to achieve that end."  Id. at 22 (internal citation and alterations omitted).  Watson argues that the Government fails to detail how the machine gun ban advances its stated interest in "promoting public safety and combatting crime" and disputes that its regulations serve either end.  Id. at 25.  He also argues the prohibition is not narrowly tailored.  Id. at 22, 23.  He contends the facts show that machine guns are held by collectors and only rarely figure in violent crime, whereas constitutionally-protected handguns are at the root of "nearly 90% of all violent crimes involving firearms."  Id. at 25, 26.  Nor can Section 922(o) survive under the more deferential intermediate scrutiny test he urges that we borrow from First Amendment jurisprudence.  Id. at 24 (quoting Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622 (1994)).  Ultimately, he asserts that the Government has presented no evidence of machine guns' dangers because (1) the Government fails to detail when machine gun thefts occurred, whether the weapons were recovered or to link them to crimes, and (2) its data on juveniles inmates confuses automatic with semi-automatic weapons. Surreply at 7.

28

3.      **Applicable Law**

The Supreme Court reached <u>Heller</u>'s holding that the District of Columbia's comprehensive ban on handguns violated the Second Amendment by parsing the Amendment's text, reviewing analogous state statutes and constitutions, and tracking the Amendment's historical understanding.  <u>Heller</u>, 554 U.S. 576-620.  "[T]he inherent right of self-defense has been central to the Second Amendment right," the Court concluded, <u>id.</u> at 628, holding the Amendment protects at its core "the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  <u>Id.</u> at 635.

Justice Scalia, writing for the majority, gave rough shape to the contours of the Second Amendment.  "Like most rights, the right secured by the Second Amendment is not unlimited." <u>Id.</u> at 626.[9]  Without undertaking "an exhaustive historical analysis . . . of the full scope of the Second Amendment," <u>id.</u>, the Court carved out from its protections a nonexhaustive list of "presumptively lawful regulatory measures" governing certain classes of people and categories of weapons.  <u>Id.</u> at 627 n. 26.

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. We also recognize another important limitation on the right to keep and carry arms. <u>Miller</u> said, as we have explained, that the sorts of weapons protected were those "in common use at the time." We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

---

[9] As our Court of Appeals observed, "There is some dispute over whether the language from <u>Heller</u> limiting the scope of the Second Amendment is dicta."  <u>Marzzarella</u>, 614 F.3d at 90 n. 5. Nonetheless, our Court adopted the Supreme Court's guidance on the Amendment's limitations, reasoning, "There is dicta and then there is dicta, and then there is Supreme Court dicta."  <u>Id.</u> (internal citation omitted).  We take our Court of Appeals's point.

Id. at 626-27 (internal citations omitted).  Reaffirming Miller, which upheld an NFA ban on transporting short-barreled shotguns, the Court described protected weapons as those with "some reasonable relationship to the preservation or efficiency of a well regulated militia."  Id. at 622 (quoting Miller, 307 U.S. at 178).  Heller reasoned that Second Amendment protection for weapons deemed "part of ordinary military equipment" under Miller must be read "in tandem with what comes after," that able-bodied men called for militia service would supply themselves with arms "in common use at the time," id. at 624 (quoting Miller, 307 U.S. at 179).

Without that limitation, Justice Scalia explained, Miller would define the Second Amendment's ambit to protect "only those weapons useful in warfare. . . . That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in Miller) might be unconstitutional, machineguns being useful in warfare in 1939."  Id.  Thus, the Court limited the Second Amendment to only include those weapons "typically possessed by law-abiding citizens for lawful purposes," id. at 625, dovetailed with the historical prohibition on "dangerous and unusual weapons."[10]  Id. at 627.

Our Court of Appeals has several times considered the post-Heller scope of the Second Amendment and we rely on its guidance here.

In Marzzarella, a defendant indicted for possessing a handgun with an obliterated serial number challenged his Indictment as-applied under the Second Amendment.  614 F.3d at 88. Our Court of Appeals devised the two-part test to determine whether an individual's asserted right falls within the Amendment's ambit.  As stated above,

> First, we ask whether the challenged law imposes a burden on
> conduct falling within the scope of the Second Amendment's

---

[10] Citing G. Heumann, Swords and Blades of the American Revolution (1973), Justice Scalia noted that militias brought weapons "used in defense of person and home [which] were one and the same."  Heller, id. at 624-25.

> guarantee. If it does not, our inquiry is complete. If it does, we
> evaluate the law under some form of means-end scrutiny. If the
> law passes muster under that standard, it is constitutional. If it fails,
> it is invalid.

614 F.3d at 89 (internal citation omitted).  Our Court of Appeals held that by linking

"presumptively lawful regulators" with restrictions on dangerous and unusual weapons, "the

[Supreme] Court intended to treat them equivalently -- as exceptions to the Second Amendment

guarantee." Id. at 91. Countering the argument that any weapon possessed in the home for self-

defense was protected under all circumstances, our Court of Appeals explained that "the

Supreme Court has made clear the Second Amendment does not protect" possession of machine

guns in the home.  Id. at 94 (citing Miller, 307 U.S. at 178, and United States v. Fincher, 538

F.3d 868, 874 (8th Cir. 2008) ( "Machine guns are not in common use by law-abiding citizens

for lawful purposes and therefore fall within the category of dangerous and unusual weapons that

the government can prohibit for individual use."), cert. denied, 129 S.Ct. 1369 (2009)).  A

weapon is dangerous and unusual in part "because of its heightened capability to cause damage."

Marzzarella, 614 F.3d at 95 (internal citations omitted).

    In Barton, our Court of Appeals rejected the defendant's facial and as-applied Second

Amendment challenge to the federal statute prohibiting firearm possession by a felon.  "The

Supreme Court has twice stated that felon gun dispossession statutes are 'presumptively

lawful,'" our Court of Appeals reasoned.  633 F.3d at 172 (citing Heller, 554 U.S. at 627 n. 26

and McDonald, 561 U.S. at 786).  Because Heller created a presumption that the prohibition

lawfully placed the felon's conduct outside the scope of the Second Amendment's coverage, the

Court held that the defendant's "facial challenge must fail."  Id.  Barton also considered whether

the defendant could rebut that presumption by "present[ing] facts about himself and his

background that distinguish his circumstances from those of persons historically barred from

Second Amendment protections." Id. at 174. Our Court of Appeals held that Barton failed to do

so. Id.; cf. Britt v. State, 681 S.E.2d 320 (N.C. 2009) (past conviction for minor non-violent

crime no bar to firearm possession under North Carolina Constitution).

Finally, our Court of Appeals held constitutional a New Jersey law requiring individuals

wanting a permit to carry handguns in public to show a "justifiable need to carry a handgun."

Drake, 724 F.3d at 428 (quoting New Jersey's Handgun Permit Law, N.J.S.A. § 2C:58-4(c)).

There, our Court of Appeals held the "justifiable need" requirement qualified as a

"presumptively lawful," "longstanding" regulation because it had been in effect in some form for

nearly ninety years and therefore "d[id] not burden conduct within the scope of the Second

Amendment." Id. at 429, 432. As a result, the majority reached only the first prong of

Marzzarella's two-step test. Nonetheless, "because of the important constitutional issues

presented" by a handgun regulation that might burden conduct deemed within the Amendment's

scope, our Court of Appeals "believe[d] it to be beneficial and appropriate to consider whether

the 'justifiable need' standard" would withstand the applicable level of scrutiny, which it deemed

to be intermediate. Id. at 430.[11] "If the Second Amendment protects the right to carry a handgun

outside the home for self-defense at all, that right is not part of the core of the Amendment." Id.

at 436 (internal citation omitted). Our Court of Appeals held the State of New Jersey

successfully met all three prongs of intermediate scrutiny. Id. at 436, 440 ("[U]nder intermediate

scrutiny the government must assert a significant, substantial, or important interest; there must

also be a reasonable fit between that asserted interest and the challenged law, such that the law

---

[11] Our Court of Appeals observed that Heller "makes clear that we may not apply rational basis review to a law that burdens protected Second Amendment conduct." Drake, 724 F.3d at 436. At the other end of the spectrum, the Court considered that strict scrutiny offered an inappropriate scope of review when a regulation did not burden the core right of handgun possession for self-defense in the home. Id. (internal citation and quotation marks omitted).

does not burden more conduct than is reasonably necessary.").

Reading our Court of Appeals's decisions together, we hold that Watson's Second Amendment challenge fails both facially and as-applied. The ban on machine guns outside the purely military context, like the felon dispossession statutes, is "presumptively lawful," as Heller held and as our Court of Appeals made pellucid in Marzzarella. We agree with the Government that there is no support in Heller for Watson's argument that the machine gun ban is an unconstitutional categorical prohibition because the weapon's military use "is a lawful purpose of firearm ownership." Br. in Opp. at 11. Whatever line divides machine guns from other destructive devices (such as anti-personnel mines, rocket-propelled grenades, and the like) is not of Second Amendment consequence. Rather, we return to Justice Scalia's distinction between arms "in common use" under Second Amendment protection and "those weapons useful in warfare" -- including machine guns -- which fall outside the Amendment's protection. Heller, 554 U.S. at 624. Neither Section 922(o) nor the NFA burden conduct covered under the Second Amendment's guarantee. Because the Second Amendment does not protect machine gun possession, Watson's facial challenge to Section 922(o) and the NFA must fail.

Because Watson offers no facts to distinguish why this presumptively lawful measure should not apply to him and his machine gun and Watson fails to distinguish his circumstances from conduct falling outside Second Amendment protection, his as-applied challenge must also fail.

Our inquiry ends at step one of the Marzzarella analysis and so we will grant the Government's motion as to Watson's Second Amendment claim. The difference between Watson's case and our Court of Appeals's reasoning in Drake confirms this reasoning. Here, as there, the existence of a long-established "presumptively lawful" statute confines our inquiry at

Marzzarella's step one.  But there, our Court of Appeals deemed means-end scrutiny an appropriate alternative because the extent of Second Amendment protection over a legitimate class of firearms (handguns) carried outside the home has as yet not been fully defined.  By contrast, the class of firearms at issue here is presumptively unlawful, whether carried inside or outside the home.  We find unpersuasive Watson's arguments that the post-1986 ban is not longstanding enough within the meaning of Heller when our Court of Appeals held that the Supreme Court made clear seventy-six years ago that the Second Amendment does not protect possession of machine guns  in the home.  Watson's contention that Heller limits "dangerous and unusual" weapons only to a threatening manner of carrying them ("affray") finds no support under Heller and, in any case, cannot overcome Heller's clear language placing machine guns among the "dangerous and unusual" firearms outside the Second Amendment's scope.  We therefore need not reach beyond step one of Marzzarella to engage in means-end analysis in order to find Watson's machine gun lies well outside the scope of the Second Amendment's coverage.

Our conclusion is fortified by the reasoning of other Courts of Appeals that have considered the machine gun ban.  In Fincher, the defendant contested his conviction for machine gun and shotgun possession by arguing that he had the right to possess the weapons under the Second Amendment "because his possession had some reasonable relationship to the maintenance of a well regulated militia."  538 F.3d at 870.  The Eighth Circuit disagreed. Applying the recent Heller decision, the Court held:

> Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use.

Id. at 874.

Similarly, in United States v. Henry, 688 F.3d 637 (9th Cir. 2012), a defendant appealed his conviction for illegal possession of a homemade machine gun under Section 922(o) -- one of the provisions Watson contests. The Ninth Circuit observed that "Heller did not specify the types of weapons that qualify as 'dangerous and unusual,' but that Court held that it would be 'startling' for the Second Amendment to protect machine guns." Henry, 688 F.3d at 640. Reviewing the roots of the machine gun in World War I combat, the capacity of modern machine guns to fire more than 1,000 rounds per minute, and the fact that private possession has been banned since 1986, the Ninth Circuit "agreed with the reasoning of [its] sister circuits that machine guns are 'dangerous and unusual weapons' " outside the Second Amendment's protection. Id. (citing cases).

We will therefore grant the Government's motion to dismiss as to Watson's Second Amendment claim.

### E.    **Watson's Commerce Clause Challenge**

We turn next to Watson's argument that, because machine guns have no substantial effect on interstate commerce, Congress lacked constitutional power to enact Section 922(o) and its accompanying regulations. Compl. at ¶ 60.

The Government argues that the Supreme Court, our Court of Appeals and other Courts of Appeal that have considered the issue have repeatedly held that this prohibition falls within the "purely intrastate activities" that affect interstate commerce and are therefore within Congress's power to regulate. MTD at 27 (citing United States v. Rybar, 103 F.3d 273 (3d Cir. 1996) (affirming conviction for machine-gun possession against Commerce Clause challenge)). Most recently, the Supreme Court held that Congress may regulate "purely local activities" that are part of a "class of activities" that have a substantial effect on interstate commerce. Id. (citing

Gonzales v. Raich, 545 U.S. 1, 17 (2005) (internal citation and quotation marks omitted)).  Any such regulation need meet only a rational basis test.  Id. at 28 (quoting Raich, 545 U.S. at 22). The Government points us to several Court of Appeals decisions applying Raich to uphold federal firearms laws.  Id.  See United States v. Stewart, 451 F.3d 1071 (9th Cir. 2006); see also Montana Shooting Sports Ass'n v. Holder, 727 F.3d 975 (9th Cir. 2013); accord United States v. Rene E., 583 F.3d 8 (1st Cir. 2009), United States v. Rose, 522 F.3d 710 (6th Cir. 2008).

Watson responds in opposition that Raich rests on Congress's rational basis for regulating intrastate manufacture and possession of marijuana as part of its larger regulatory goal to prohibit the interstate drug trade as enacted in the Controlled Substances Act ("CSA").  Br. in Opp. at 27. In contrast, he contends that "Heller declared beyond a doubt that Congress cannot outright prohibit firearms."  Id.  He contests the Government's assertion that Section 922(o) is part of a larger regulatory scheme to keep firearms out of the hands of those not legally entitled to possess them because Congress has made no such findings and the Government's briefs fail to show how machine gun possession by law-abiding citizens undermines Congressional efforts with respect to proscribed persons.  Id. at 28.  He also asserts that Congressional findings before the 1986 ban fail to include any facts bearing on interstate commerce -- except for the then-ATF Director's statement that "machine guns which are involved in crimes are so minimal so as not to be considered a law enforcement problem."  Id. at 29 (quoting Armor Piercing Ammunition and the Criminal Misuse and Availability of Machineguns and Silencers: Hearings on H.R. 641 and Related Bills Before the Subcomm. On Crime of the House Com. on the Judiciary, 98th Cong. 208 (1986)).

Watson treads a path others have taken before and reached the same end:  There is no doubt, under our Court of Appeals's twenty year-old Rybar decision and the Supreme Court's

Raich decision since, that Congress acted well within its Commerce Clause powers when prohibiting machine gun manufacture and possession.

In Rybar, a machine gun dealer sought to challenge Section 922(o) in the wake of United States v. Lopez, 514 U.S. 549 (1995), which limited Congress's Commerce Clause power. Our Court of Appeals applied a two-part test, determining first that "Congress could rationally conclude that the regulated activity substantially affects interstate commerce," and, next, that Congress's means are "reasonably adapted to the end permitted by the Constitution." Rybar, 103 F.3d at 278. Surveying the extensive history of Congressional firearm regulation from the NFA in 1934, to the 1968 enactment of the Omnibus Crime Control and Safe Streets Act incorporating the Federal Firearms Act, to the GCA later that year -- statutes Watson also challenges -- our Court of Appeals observed of the 1986 legislative focus on machine guns that

> [b]y the time Congress passed the [Act] of which § 922(o) is a part[,] it had already passed three firearm statutes under its commerce power based on its explicit connection of the interstate flow of firearms to the increasing serious violent crime in this country, which Congress saw as creating a problem of national concern.

Id. at 281 (internal quotation marks omitted). Against that legislative backdrop, our Court of Appeals found no obligation that Congress must make specific findings linking machine guns to interstate commerce because Congress could have reasonably concluded that a general ban would meaningfully impact interstate commerce. Contrary to Watson's argument that Congress may not ban machine guns because it failed to make specific findings identifying indicia of interstate commerce, our Court of Appeals concluded that "Congress' intent to regulate possession and transfer of machine guns as a means of stemming interstate gun trafficking is manifest." Id. at 282.

Rejecting the appellant's view, which Watson also advances, that the non-commercial

intrastate manufacture of machine guns would not undercut Congress's goal, our Court of Appeals also observed, "Supreme Court cases have long sustained the authority of Congress to regulate singular instances of intrastate activity when the cumulative effect of a collection of such events might ultimately have substantial effect on interstate commerce." Id. at 283.[12]  Our Court of Appeals thereby joined five other Circuits in rejecting the Commerce Clause challenge to Section 922(o).

The prohibition upheld in Raich only reinforces that holding.  In that case, the Supreme Court held that under the Commerce Clause Congress may criminalize the production and consumption of home-grown marijuana under the Controlled Substances Act even when states approve it for medicinal use.  The Supreme Court identified three broad areas where Congress may regulate under its expansive Commerce Clause power.

> First, Congress can regulate the channels of interstate commerce. Second, Congress has authority to regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce. Third, Congress has the power to regulate activities that substantially affect interstate commerce.

Raich, 545 U.S. at 16-17 (internal citation omitted).  Applying the third prong, the Supreme Court held that "Congress can regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity."  Id. at 18 (citing Wickard v. Filburn, 317 U.S. 111, 127-28 (1942)).  Raich reaffirmed that "the absence of particularized findings does not call into question Congress' authority to legislate."  Id. at 21.  More to the point here, the Supreme Court rejected any argument that Congress lacks power to prohibit commerce

---

[12] Accord United States v. Kenney, 91 F.3d 884 (7th Cir. 1996).  See also United States v. Beuckelaere, 91 F.3d 781 (6th Cir. 1996); United States v. Rambo, 74 F.3d 948 (9th Cir. 1996); United States v. Kirk, 70 F.3d 791 (5th Cir. 1995); and United States v. Wilks, 58 F.3d 1518 (10th Cir. 1995), sustaining Section 922(o) as a proper exercise of Congress' commerce power.

in a particular commodity, which is important in view of Watson's claim that "Heller declared beyond a doubt that Congress cannot outright prohibit firearms."  Br. in Opp. at 27.  To the contrary, "[i]t has long been settled that Congress' power to regulate commerce includes the power to prohibit commerce in a particular commodity." Raich at 19 n. 29 (citing Lopez, 514 U.S. at 571 (Kennedy, J., concurring)).   Heller does not change that.

Although our Court of Appeals has not revisited Rybar in light of Raich, other Courts of Appeals have concluded that Raich upholds Congress's power to ban machine guns.  The Ninth Circuit sustained Section 922(o) against a Commerce Clause challenge concluding that "Congress had a rational basis for concluding that in the aggregate, possession of homemade machineguns could substantially affect interstate commerce in machineguns because [they]. . . can enter the interstate market and affect supply and demand." Henry, 688 F.3d at 641 (quoting Stewart, 451 F.3d at 1078) (internal quotation marks omitted).  "Every other circuit that has reached the issue has similarly held that § 922(o) is constitutional under the Commerce Clause." Id. (citing cases).

In light of the well-established holdings by our Court of Appeals and other circuits that Congress did not exceed its Commerce Clause power when it prohibited machine gun manufacture and possession, both Watson's facial and as-applied challenges to the NFA and Section 922(o) must fail.  We therefore grant the Government's motion to dismiss as to this Count.

### F.    Watson's Due Process Challenge

We consider next Watson's claim that the BATFE violated his Due Process rights by revoking the issued tax stamp and approval of ATF Form 1 and then requiring him to surrender the machine gun.

The Due Process Clause of the Fifth Amendment states no one shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Procedural due process inquiries proceed in two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State, the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." Kentucky Dept. of Corrections v. Thompson, 490 U.S. 454, 460 (1989) (internal citations omitted). As the Supreme Court has long held, "Property interests . . . are not created by the Constitution. Rather they are created . . . by existing rules or understandings that stem from an independent source." Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972); see also Abbott v. Latshaw, 164 F.3d 141, 146 (3d Cir. 1998) ("[P]rocedural due process is implicated only where someone has claimed that there has been a taking or deprivation of a legally protected liberty or property interest.")

The Government argues that there is no need for us to go beyond the first step because Watson had no property interest in his illegal machine gun that he "manufactured after ATF's erroneous approval of [his] ATF Form 1." MTD at 30. The ministerial error that led to that approval, the Government maintains, does not create a property interest. Id. The Government contends that the GCA's prohibition on machine guns not lawfully possessed or registered before 1986 is fatal to Watson's claim because a protected property interest requires a "legitimate claim of entitlement." Id. at 31 (quoting Roth, 408 U.S. at 577). "[B]ecause a machine gun constitutes obvious contraband under Federal law, [Watson] cannot seriously argue that he had a protected property interest in the weapon he manufactured." Id. (internal citations and quotation marks omitted). Nor does Watson's machine gun bear any property interest commonly associated with property, as federal firearms laws prohibit Watson from selling, assigning, or transferring his machine gun. Id. at 33.

By the same token, the Government argues, Watson cannot establish a protected property interest in an erroneously approved application.  Id.  The Government concedes that issuance of an administrative approval can create a protected property interest, but only when the "continued possession" of that approval "become[s] essential in the pursuit of a livelihood."  Id. at 33 (quoting Bell v. Burson, 402 U.S. 535, 539 (1971)).  But Watson does not here allege he intended his machine gun making to constitute any "livelihood."  Id.  The Government contends that because Section 922(o) prohibits possession of machine guns, only governmental entities' applications may be approved pursuant to the NFA, 26 U.S.C. § 5861(f).  Id. at 32.

Finally, the Government states that (1) counter to Watson's allegation that the ATF lacks the authority to revoke authorization, that Agency may, of its own initiative, undo what has been improvidently done, id. at 32 n. 20, and (2) even if Watson had a cognizable property interest, his post-deprivation remedy was not "constitutionally inadequate" because the ATF reversed its approval quickly, thereby preventing the mistaken manufacture of an additional weapon and giving Watson the chance to reapply if he believed the decision to be in error.  Id. at 34 n. 21.

Watson responds in opposition that the Government overlooks the fact that the Trust, also a party to this action, received approval to make the machine gun.  Br. in Opp. at 30.  He argues that the Trust "is not subject to the provisions of [Section] 922(o) under the plain language of the law," and is thus "permitted to manufacture or possess a machine gun manufactured after 1986, so long as the Trust complies with the provisions of the NFA."  Id. at 31.  Watson maintains that the Trust has a "legitimate claim of entitlement" to the machine gun and the Government had no legal basis on which to deny the Form 1 once approved.  Id.  He also argues that his ability to "possess and use the machine gun and exclude others from its use" without the Government's intervention creates a protectable property interest in both the firearm and the approved Form 1.

Id. at 32.

Watson also scoffs at the idea that the Government provided any post-deprivation remedy.  Id.  He contends that he has adequately pled a Fifth Amendment claim for relief because the Trust had a property interest in the confiscated firearm and the Form 1.  Id. at 32, 33.

In reply, the Government argues that the plaintiff's Trustee status is beside the point because Watson's constitutional claims rest on the statutory text of Section 922(o) and his pleadings do not identify anyone who was treated differently.  Reply at 9.  Watson's "attempt[] to construe the NFA's definition of 'person' to place the trustees of unincorporated trusts beyond the scope of firearms regulations" is an "idiosyncratic interpretation" that cannot prevail when machine guns are "obvious contraband."  Id. at 10.  As the ATF explained in its letter to Watson, attached to his Complaint, "transfer of an NFA firearm to a trustee. . . is made to this person as an individual (i.e. not as a trust)."  Id.; see also Compl. at Ex. A.  The Government contends the Agency's authoritative interpretation governs because it is consistent both with the Restatement (3d) of Trusts § 2 (2003) -- which states that a Trust is not a legal person capable of owning property -- and with "Congress's intent to prohibit the post-1986 manufacture of machine guns" except as specifically permitted.  Id. at 10.

We address first Watson's contention that the Trust's exclusion from Section 922(o)'s definition of a "person" must limit that statute's reach.  It is well-established that a trust is not a legal "person" but rather a legal term for a relationship having certain characteristics.  See 1 Restatement (Third), Trusts § 2 (2003); see also G. Bogert & A. Hess, 1 Trusts and Trustees (3d ed. 2007) § 1.  A Trust "is not an entity distinct from its trustees and capable of legal action on its own behalf" but merely represents "a fiduciary relationship with respect to property."  76 Am. Jur. 2d Trusts § 3 (2015).  It cannot contract or own property.  Id.  Watson's contention that the

Trust acted to file the Form 1 and has possession of the machine gun is neither legal fact nor legal fiction, but legal nullity.  Thus, we disregard Watson's argument that the Trust had any property interest in either the Form 1 or the machine gun.  It did not because it could not.

As to Watson himself, we agree with the Government that Watson has no legally protected interest in either the Form 1 or the machine gun.  As the Supreme Court explained in Roth, to have a protected property interest, "a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  408 U.S. at 577.  But no legitimate entitlement can arise when possession of the property at issue is expressly forbidden.  Despite Watson's assertion of certain property rights, such as his ability to use the machine gun and exclude others from using it, the most basic right -- to possess the machine gun -- remains illegal.

Likewise, Watson has no legitimate claim of entitlement to his Form 1. The Supreme Court in Burson considered a Georgia law under which an uninsured motorist's driver's license would be suspended unless he could post security for the amount of damages claimed by another party to the accident.  The pre-suspension procedures excluded considerations of fault or responsibility, yet "[o]nce licenses are issued,. . . their continued possession may become essential in the pursuit of a livelihood." 402 U.S. at 539.  The Court held that

> Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment.

Id.  We agree with the Government that Watson has no entitlement to procedural due process on the revocation of the Form 1.  Contrary to Burson, where pre-deprivation due process is needed to protect a legitimate interest, Watson has no legitimate "important interests" in the Form 1. While the Supreme Court held that procedural due process was needed to safeguard an

important, perhaps essential, right, Watson cannot claim his alleged entitlement to the Form 1 constitutes such a right when only governmental entities' applications for machine guns may be approved pursuant to the NFA.  That the agency charged with administering the firearms statutes erred in approving the Form 1 is of no moment because the GCA and NFA expressly prohibit making or possessing such a firearm in all instances save in an approved official capacity.  <u>See</u> 18 U.S.C. § 922(o)(2)(A) and (B); <u>see</u> <u>also</u> 26 U.S.C. § 5822(e) ("Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law.").  Watson manifestly also did not rely on the Form 1 for his livelihood.

Because Watson has no cognizable interest in either the Form 1 or the machine gun, we conclude the procedural due process inquiry at the first step and so need not examine whether the procedures before or after the deprivation were constitutionally sufficient.

We will therefore grant the Government's motion to dismiss Watson's Due Process claim.

### G.   <u>Watson's Equal Protection and Detrimental Reliance Claims</u>

Lastly, we consider Watson's Equal Protection and detrimental reliance claims.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The Supreme Court has held this protection is encompassed in the Fifth Amendment's Due Process Clause and therefore applies to the federal government.  <u>Bolling v. Sharpe</u>, 347 U.S. 497 (1954).

The Government contends, first, that Watson's claim upon "information and belief" that the ATF "approved the manufacture and transfer of post-1986 machine guns to various individuals" -- which he characterized as a denial of equal protection -- fails to meet the pleading

standards Iqbal and Twombly impose because it does not include "factual content that allows the court to draw the reasonable inference that [the Government] is liable for the misconduct alleged." MTD at 35 (quoting Iqbal, 556 U.S. at 678). The Government next contends that we draw upon our "judicial experience and common sense," id. (quoting Iqbal, 556 U.S. at 678-79), to hold that Watson has not begun to make a legitimate equal protection claim by not alleging that any distinction between him and those allegedly permitted to make machine guns rests on his membership in a suspect class. Id. "Absent such an allegation," we must evaluate an equal protection claim under rational basis scrutiny. Id. (citing Mabey Bridge & Shore, Inc. v. Schoch, 666 F.3d 862, 876 (3d Cir. 2012)). The Government argues that it may permissibly distinguish between Watson and other applicants "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes" that the Government's actions must be irrational. Id. (quoting Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 84 (2000)).

As to Watson's claim that the ATF should be estopped from revoking its approval of his Form 1 -- which the Government characterizes as equitable estoppel or detrimental reliance -- it contends that no such claim can "lie against the Government as it lies against private litigants." Id. at 36 (quoting Office of Pers. Mgmt. (OPM) v. Richmond, 496 U.S. 414, 419 (1990). Obedience to the rule of law would be undermined if the Government were unable to enforce a law because its agents' action gave rise to an estoppel. Id. See also Heckler v. Cmty. Health Servs., 467 U.S. 51, 60 (1984).

An estoppel claim requires a plaintiff to prove (1) misrepresentation by the other party, (2) on which he reasonably relied, (3) to his detriment." MTD at 37; see also United States v. Asmar, 827 F.2d 907, 912 (3d Cir. 1987). In claims against the Government, a plaintiff must

also prove "affirmative misconduct." Id. (citing Asmar, 827 F.2d at 912).  The Government

contends that Watson can at best show the ATF examiner who approved the application acted in

error, under a mistaken belief Watson presented valid grounds to modify the machine gun -- a

mistake that falls well short of affirmative misconduct.  Id.  It also claims "it is questionable

whether" Watson can show any legitimate reliance.  Id. at 37 n. 22.[13]

Watson responds in opposition that the proper standard for evaluating his Equal

Protection claim is strict scrutiny, not rational basis, because the right to keep and bear arms is a

fundamental right.  Br. in Opp. at 33 (citing McDonald, 561 U.S. at 778).  Therefore, he argues,

the Government must show that it had a compelling interest to treat him differently than those

who he alleges were approved.  Id.  He contends he has met the Iqbal/Twombly pleading

standard and should therefore survive the Government's motions to dismiss and for summary

judgment.  Id.

As to his detrimental reliance claim, Watson rejects the Government's description of the

Form 1 approval as "mistake" or "error," because (1) his second Form 1 had been approved then

disapproved and (2) a plaintiff in another matter also received approval.  Id. at 35.  "Quite

clearly, [the Government] had [an imagined] concerted plan . . . to approve Form 1 applications"

such as his "which were submitted by trusts. . . and later changed course."  Id.  He argues that the

Agency's claimed approvals, which put the Government in violation of federal law and its own

---

[13] The Government also cites F.J. Vollmer Co. v. Higgins, 23 F.3d 448 (D.C. Cir. 1994), where
the D.C. Circuit rejected a machine gun maker's detrimental reliance contention that he
erroneously relied on an ATF letter advising him that he could legally modify a gun to make it
into a machine gun.  Id. at 37.  The Court held the letter's "general statements" did not represent
"the sort of affirmative misconduct required to estop the government from enforcing its laws."
Higgins, 23 F.3d at 450 (quoted in MTD at 38).

regulations, constitutes the requisite "affirmative misconduct."  Id. at 35, 36.[14]  He contends that

granting him relief would not undermine the rule of law because the Government has explicit

authority to register even an unlawfully possessed machine gun.  Id. at 37 (citing 27 C.F.R. §

479.101(b)).

 In reply, the Government states that its established interpretation of regulations

prohibiting private possession of machine guns precludes Watson's detrimental reliance claim.

Reply at 11.[15]

 We will not tarry over the Government's argument that Watson's Equal Protection's

claim falls short of pleading standards by relying upon "information and belief."  "[A]llegations

in this form have been held to be permissible, even after the Twombly and Iqbal decisions." 5

Wright, Miller & Kane, Federal Practice & Procedure § 1224 (3d ed. 2015).  This form of

pleading finds its parallel in Rule 8(b)'s provision that a responding party may state he is

"without knowledge or information" concerning the truth of an averment.  Id.; see also Fed. R.

Civ. P. 8(b)(5).[16]

---

[14] Watson argues Higgins is readily distinguishable because unlike Higgins's reliance on his own interpretation of the ATF's statements in a letter, Watson relied on official approval.  Br. in Opp. at 36.

[15] The Government also draws our attention to Exhibit A of Watson's Complaint (a March 17, 2014 letter to another entity, not a party to this litigation, which sets forth the Government's interpretation of "person" to exclude unincorporated trusts) and Watson's submission of his second Form 1 on June 24, 2014 -- more than three months later -- which  received the erroneous Agency approval on August 5, 2014.  Reply at 11 (citing Compl. at ¶ 38, 39).

[16] "Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject."  5 Wright, Miller & Kane, Federal Practice & Procedure § 1224 (3d ed. 2015).  It bears mention that certain fraud allegations that have a heightened pleading standard may not be pled on information and belief. See United States ex rel. Knisely v. Cintas Corp, Inc. 298 F.R.D. 229, 241 (E.D. Pa. 2014) (Dalzell, J.)

As to the substance of Watson's Equal Protection claim, he alleges, without bothering to elaborate or identify anyone, that others received permission to make or possess machine guns. Compl. at ¶ 76.  To prevail, Watson must show that any classification at issue "proceeds along suspect lines" or "infringes fundamental constitutional rights."  FCC v. Beach Commc'ns, 508 U.S. 307, 313 (1993).  Watson argues that permitting [unnamed] others to possess post-1986 machine guns infringes on his fundamental constitutional right to bear arms.  As we have already disposed of that constitutional claim, we hold it cannot support Watson's Equal Protection claim. He does not and cannot allege that any distinction rested on a suspect class.  Thus, the Government may treat others more favorably than Watson "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," Mabey Bridge, 666 F.3d at 876.  We agree with the Government that Watson has not explained who has been treated more favorably.

Finally, we consider Watson's detrimental reliance claim.  As stated above, he must show (1) the Government's misrepresentation, (2) on which he reasonably relied, (3) to his detriment, and the Government's "affirmative misconduct" caused him cognizable legal harm.  Mudric v. Attorney General of the United States, 469 F.3d 94, 99 (3d Cir. 2006).

We agree that Watson cannot make out a detrimental reliance claim because he cannot show that his reliance on the approval of his Form 1 was to his detriment.  To begin with, "[w]hen a private party is deprived of something to which it was entitled of right, it has surely suffered a detrimental change in its position."  Heckler, 467 U.S. at 62.  But here, as in Heckler (where a health care provider challenged the attempted recoupment of Medicare overpayments), Watson "lost no rights," id., because, as shown at length above, Watson has no right to make or own a machine gun.  He "cannot raise an estoppel" claim without showing he is "significantly

worse off" than he would have been if he had never received the BATFE approval.  Id. at 63.

And we agree with the Government that the erroneous approval does not rise to the level of

"affirmative misconduct."  Our Court of Appeals has held that "affirmative misconduct" requires

something far more than mere negligence.  Mudric, 469 F.3d at 99.  See also Schweiker v.

Hansen, 450 U.S. 785, 788 (1981) ("Lower federal courts have . . . consistently refus[ed] to estop

the Government where an eligible applicant has lost Social Security benefits because of possibly

erroneous replies to oral inquiries.") (citing cases).

We will therefore grant the Government's motion to dismiss Watson's Equal Protection

and detrimental reliance claims.

## V.      Conclusion

For the reasons articulated above, we hold that Watson has standing to bring his

constitutional challenges to the NFA and GCA.  But we will nevertheless grant the

Government's motion to dismiss his complaint because (1) the Second Amendment does not

protect the manufacture and possession of machine guns, and (2) Congress acted well within its

established Article I Commerce Clause power to enact the machine gun bans, as we hold above.

Additionally, Watson's Due Process claim must also be dismissed because he cannot show that

he had a legitimate claim of entitlement in either the machine gun or an approved application.

Finally, we also grant the Government's motion to dismiss Watson's Equal Protection and

detrimental reliance claims.

An appropriate Order follows.

BY THE COURT:

   /s/ Stewart Dalzell, J.
Stewart Dalzell, J.